**MODIFY and AFFIRM; and Opinion Filed July 1, 2015.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-14-00640-CR

### CRAIG EVERETT HALTON, Appellant
### V.
### THE STATE OF TEXAS, Appellee

**On Appeal from the 291st Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. F-1371883-U**

## MEMORANDUM OPINION
Before Justices Fillmore, Myers, and Evans
Opinion by Justice Fillmore

A jury found appellant Craig Everett Halton guilty of the second degree felony offense of

family violence assault by impeding breathing or blood circulation. *See* TEX. PENAL CODE ANN.

§§ 22.01(a), (b-1) (West Supp. 2014). The trial court found enhancement paragraphs true and

assessed punishment of twenty-five years' confinement. In six points of error, Halton complains

(1) the evidence is insufficient to prove the existence of a dating relationship with the

complainant, (2) the trial court erred by failing to properly define and apply the term "dating

relationship" in the jury charge, (3) the trial court erred by failing to limit the definitions of

culpable mental states to the applicable conduct element in the jury charge, (4) the trial court

erred by admitting evidence of a prior conviction in the guilt-innocence phase of trial, (5) the

trial court erred by including a definition of "reasonable doubt" in the jury charge, and (6) the

trial court lacked jurisdiction to hear and render judgment in this case. We reform the trial

court's judgment to reflect Halton pleaded "not true" to the first enhancement paragraph of the indictment. As reformed, we affirm the trial court's judgment.

## Background

Halton was indicted for intentionally, knowingly and recklessly causing bodily injury to Latoya Thomas by "impeding the normal breathing and circulation of [Thomas's] blood by applying pressure to [Thomas's] throat and neck and by blocking [Thomas's] nose and mouth with the use of an arm." The indictment further alleges Halton "has and has had a dating relationship with [Thomas] and [Halton] was a member of [Thomas's] family and household."

Thomas testified at trial.[1] Thomas indicated that at approximately 2:00 a.m. on September 11, 2013, she was walking to her residence at Richland Trace Condominiums when she saw Halton, who also resided on the property.[2] A female who was with Halton was crying and asked to use Thomas's phone. Thomas testified she was frightened when she saw Halton because she had previously been assaulted by him on October 3, 2012, and feared retribution for criminal proceedings against Halton relating to that assault. Thomas tried to keep her head down so Halton would not recognize her, however Halton did recognize her.

Thomas went to the condominium unit of a friend, Anthony Bingham, and asked if she could sit down for a while. Thomas then asked Bingham to watch as she walked to her residence to ensure Halton was not outside waiting for her. As she and Bingham descended the stairs outside Bingham's residence, Thomas saw Halton at the bottom of the stairs. Halton said, "Ty, let me holler at you." Thomas declined. Bingham told Halton to leave Thomas alone. Halton said, "No. This is my bitch. It's my ho. She [sic] going to do what I say right now." Halton

---

[1] Thomas, who was twenty-eight years old at the time of trial, testified she had pleaded guilty to a Class B misdemeanor theft charge ten or eleven years before. She also testified that as a minor, she had been adjudicated as having engaged in delinquent conduct as a result of an assault.

[2] Although she had been drinking alcohol and smoking marijuana earlier in the evening and was "tipsy," Thomas indicated when she saw Halton she "snapped out" and was no longer "tipsy."

tried to snatch a sack of items Thomas was carrying. Thomas and Halton "put up a fight with each other," and Halton punched Thomas in the face three times. Thomas testified that Halton remarked, "I should have killed you last time," and that he had spent nine months in jail because of her.

According to Thomas, Halton came at her from behind and put his left arm around her in a "headlock" or "choke hold." Halton "got her on the ground," and he was suffocating her to the point she could not breathe. The assault was very painful, and Thomas urinated on herself. Halton dragged her toward his condominium unit. However, private security officers arrived at the scene and "maced" Halton to "get him off" her. Halton then ran to his residence and locked the door. Soon thereafter, paramedics and police officers arrived at the scene. Thomas spoke with the police and filled out a statement. Paramedics provided Thomas with an ice pack to reduce swelling relating to her injuries. She declined to go to the hospital following the assault.

Photographs of Thomas taken at the scene were admitted in evidence. Thomas testified she sustained a scratch on her leg and she had bruises and purple marks on her neck as a result of Halton strangling her, but the marks on her neck did not show in the photographs because it was dark when the photographs were taken and because she has a dark complexion. She testified she remained sore for a week or two following the assault.

Thomas testified that while she is not a member of Halton's family, she and Halton had a dating relationship in 2012. According to Thomas, she and Halton shared companionship and kissed during their relationship, but she did not have sexual relations with him and was not dating him "intimately." Thomas testified she also had a business relationship with Halton, who paid her to perform light house cleaning, washing, and meal preparation for Halton's ill brother. A judicial confession signed by Halton on May 6, 2013, in Case No. F-1272132-U, which related to the October 3, 2012 offense involving Thomas, was admitted into evidence. The judicial

confession contained a stipulation that Halton "has and has had a dating relationship with [Thomas] and [Halton] was a member of [Thomas's] family and household."

Christopher Peterson, a private security officer who was working at Richland Trace Condominiums at the time of the September 11, 2013 assault, testified that while conducting a patrol of the property, he received a call from a resident that a fight was taking place in the common areas of a building on the property. Peterson and his partner, Marlan Whyte, went to the location where they observed an African-American male he recognized as Halton with his wrist or arm around Thomas's neck choking her. Peterson did not know Thomas personally, but had seen her on the property. This was the first time Peterson had seen Halton and Thomas together; he determined later that the relationship between Halton and Thomas was a dating relationship.

Peterson described Thomas as laying down on top of Halton with him having her in a choke hold and pulling up on her. Peterson denied that Halton was hugging Thomas and stated that Halton's grasp on Thomas was "far from a hug." Thomas appeared frightened. When Halton observed Peterson and Whyte exiting their vehicle, he released Thomas and climbed the stairs to the condominium unit where he and his brother lived. Peterson and Whyte pursued Halton and a scuffle ensued. Halton swung at Whyte, and Whyte responded by deploying pepper spray. Halton fled into his condominium unit. Halton's brother had previously told Peterson that he had seen guns inside the residence, and for that reason, Peterson did not pursue Halton into the residence.

After Halton released Thomas, she was terrified, wheezing, and having difficulty breathing. Peterson contacted paramedics to come to the scene. After arrival of the paramedics, Peterson learned Halton had punched Thomas in the face and injured her lip. Peterson had seen Halton choking Thomas, but he had not seen Halton strike Thomas. Peterson placed a 9-1-1

–4–

telephone call to request the dispatch of police officers to the scene. A recording of that telephone call was admitted in evidence and heard by the jury. During the call, Peterson indicated to the police that an African-American male had choked, punched, and dragged a female victim by her hair through a common area of the condominium complex and the male had retreated inside a condominium unit after pepper spray had been deployed. Peterson told the operator that an ambulance had been summoned because the victim wanted to be "checked out" and was in pain from being dragged by her hair.

Two days after the assault, Peterson met with and provided a written statement to a Dallas Police Department detective. Peterson identified Bingham as a witness to the incident. Peterson knew Bingham as a result of loitering and heavy "foot traffic" at Bingham's condominium unit, which made Peterson suspicious of drug activity at that location. Peterson informed the detective that Whyte was with him at the time of the incident, and if Whyte had told the detective otherwise, Whyte was mistaken.

Whyte testified he was working at Richland Trace Condominiums at the time of the September 11, 2013 assault. Whyte did not recall speaking with a Dallas Police Department detective on the phone and denying he was working at that location at the time of the incident. Whyte recounted that when he and Peterson arrived at the scene, Thomas was on top of Halton, and Halton had his arm around Thomas's neck and was choking her. Whyte did not know Thomas before this assault, but he had seen her walking on the property. Whyte did not see Halton strike Thomas, but there was no doubt in Whyte's mind that Halton was choking her. When Halton saw Whyte and Peterson approaching, he fled. At that point, Thomas was gasping for air, and Whyte believed he and Peterson had saved Thomas's life.

Whyte and Peterson pursued Halton. Whyte attempted to pepper spray Halton, but he is not certain whether the spray made contact. Halton ran into his condominium unit and asked

–5–

Whyte to come inside, but Whyte declined. Dallas Police Department officers who were called to the scene were not able to locate Halton that night. Halton telephoned Richland Trace Condominiums several times that night claiming to be at various locations, but Halton was not found at any of those locations.

Dallas Police Department officer Laura O'Dell testified she responded to the dispatch communication regarding a disturbance at Richland Trace Condominiums in the early morning hours of September 11, 2013. Upon arrival at the scene, Thomas "flagged" her down and seemed upset as a result of what had just happened to her. Thomas informed O'Dell that she was standing in the parking lot speaking to a neighbor when Halton came up to her and yelled for her to come over. Thomas said she would not, and Halton approached Thomas, grabbed her belongings, and hit her on the back of the head. Thomas told Halton to calm down. Instead, he grabbed her, put his arm around her throat and, with his forearm around her neck, began to drag her. Thomas indicated to O'Dell that she had been strangled by Halton and was experiencing a great deal of pain. O'Dell was not able to locate Halton at that time. During her conversation with Thomas, O'Dell learned that this was a domestic violence situation since Thomas and Halton had a dating relationship. Thomas filled out a domestic violence screening list, and O'Dell filled out a family violence packet based on Thomas informing O'Dell that she and Halton had an intimate relationship.

Sheila Greene, a Dallas Police Department detective, testified she had worked ten years in the Family Violence Unit investigating crimes related to intimate partner and family violence. She has experience training officers on how to investigate and document strangulation assaults. Greene explained that strangulation is an intentional act that occurs by placing external pressure on the neck and arteries, impeding either blood flow or breath, or by covering of a person's nose and mouth. In at least sixty percent of cases, signs of strangulation are not immediately visible;

in some cases, there are never any visible external injuries. External signs of strangulation are more likely if the perpetrator applies pressure with fingers and thumbs, as opposed to a choke hold. However, there are not always visible signs of strangulation even if the perpetrator applies pressure with fingers and thumbs, depending on the duration and amount of pressure applied during the assault. Further, the effects of bruising or marks left after strangulation are difficult to detect if the victim has a darker complexion. According to Greene, neck pain can result from strangulation, and soreness following strangulation can last for a week or more after the assault. In addition, disorientation and urination can result from strangulation.

Elaina Longoria, an investigator for the Dallas County District Attorney, testified concerning a telephone call made by Halton while in jail following his arrest. A recording of the telephone call was admitted in evidence and played for the jury. On the recording, Halton stated that he had not choked Thomas, but instead had given her a hug.

Halton's cousin, Clyde Rollins, testified that prior to the incident at issue, Halton had resided at a shelter Rollins operated for homeless and low-income individuals. A short time before the incident, Halton moved in with his brother because the brother had issues with his health and with individuals taking advantage of him. Rollins had cautioned Halton that the neighborhood where his brother lived was "a bad neighborhood to go to." Rollins testified he had no knowledge of what occurred in the incident at Richland Trace Condominiums on September 11, 2013.

The jury found Halton guilty of "Assault Family Violence Impeding the Breathing or Circulation, as charged in the indictment." After finding two enhancement paragraphs true, the trial court assessed punishment of twenty-five years' confinement. Halton's motion for new trial was overruled by operation of law, and Halton filed this appeal.

## Sufficiency of the Evidence

Halton was indicted for intentionally, knowingly and recklessly causing bodily injury to Thomas by impeding breathing and blood circulation by applying pressure to Thomas's throat and neck and by blocking Thomas's nose and mouth with his arm. The indictment further alleges Halton "has and has had a dating relationship" with Thomas. In his first point of error, Halton contends the evidence is insufficient to prove the existence of a dating relationship between him and Thomas. According to Halton, no rational jury could have found the existence of a dating relationship beyond a reasonable doubt because Thomas testified "there is no such relationship."

We review the sufficiency of the evidence under the standard set out in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Matlock v. State*, 392 S.W.3d 662, 667 (Tex. Crim. App. 2013). We examine all the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Matlock*, 392 S.W.3d at 667. This standard recognizes "the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319; *see also Adames v. State*, 353 S.W.3d 854, 860 (Tex. Crim. App. 2011). As the factfinder, the jury is entitled to judge the credibility of the witnesses, and can choose to believe all, some, or none of the testimony presented by the parties. *Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991); *see also Wise v. State*, 364 S.W.3d 900, 903 (Tex. Crim. App. 2012) ("The factfinder exclusively determines the weight and credibility of the evidence.").

We defer to the jury's determinations of credibility, and may not substitute our judgment for that of the jury. *Thornton v. State*, 425 S.W.3d 289, 303 (Tex. Crim. App. 2014); *King v. State*, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000) (in conducting legal sufficiency analysis,

appellate court may not re-weigh the evidence and substitute its judgment for that of the jury). "[R]econciliation of conflicts in the evidence is within the exclusive province of the jury." *Wyatt v. State*, 23 S.W.3d 18, 30 (Tex. Crim. App. 2000) (quoting *Losada v. State*, 721 S.W.2d 305, 309 (Tex. Crim. App. 1986)). When there is conflicting evidence, we must presume the factfinder resolved the conflict in favor of the verdict, and defer to that resolution. *Jackson*, 443 U.S. at 326; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). Circumstantial evidence is as probative as direct evidence and, alone, can be sufficient to establish guilt. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). When conducting a sufficiency review, we consider all evidence in the record of the trial, whether it was admissible or inadmissible. *Winfrey v. State*, 393 S.W.3d 763, 767 (Tex. Crim. App. 2013); *Conner v. State*, 67 S.W.3d 192, 197 (Tex. Crim. App. 2001) ("When conducting a sufficiency review, we consider all the evidence admitted, whether proper or improper."). Evidence is sufficient if "the inferences necessary to establish guilt are reasonable based upon the cumulative force of all the evidence when considered in the light most favorable to the verdict." *Wise*, 364 S.W.3d at 903.

Section 71.0021(b) of the family code provides that a "dating relationship" means "a relationship between individuals who have or have had a continuing relationship of a romantic or intimate nature." TEX. FAM. CODE ANN. § 71.0021(b) (West 2014). Thomas testified that in 2012, she and Halton had a dating relationship during which they shared companionship and kissed. However, Thomas denied she had sexual relations with Halton and testified she does not consider a relationship without sex "dating intimately." Also, Halton's judicial confession in the prior offense involving Thomas was admitted in evidence in which he confessed and stipulated that he "has and has had a dating relationship with [Thomas] and [Halton] was a member of [Thomas's] family and household."

According to Halton, evidence at trial of a dating relationship between Thomas and Halton came only from Halton's judicial confession and Thomas's testimony. However, that contention ignores the testimony of Peterson, who testified he determined after the assault that Thomas and Halton had a dating relationship, and the testimony of O'Dell, who indicated she learned from Thomas that Thomas and Halton had a dating, "intimate" relationship. Halton's contention also ignores Thomas's testimony that Halton stated the night of the assault that she was his "bitch" and his "ho."

In attempting to discount his own judicial confession in Case No. F-1272132-U that he "has and has had a dating relationship" with Thomas, Halton argues that confession and stipulation of a dating relationship predated the incident at issue and was not a stipulation that a dating relationship existed at the time of the September 11, 2013 assault. However, the family code definition of dating relationship encompasses both a contemporaneous and a past dating relationship. *See* TEX. FAM. CODE ANN. § 71.0021(b) ("have or have had" a continuing relationship of a romantic or intimate nature).

Viewing the evidence in the light most favorable to the verdict, we conclude there was sufficient evidence for a rational factfinder to find beyond a reasonable doubt that Halton and Thomas had a "dating relationship," that is, "a relationship between individuals who have or have had a continuing relationship of a romantic or intimate nature." *See* TEX. FAM. CODE ANN. § 71.0021(b). We resolve Halton's first point of error against him.

### Jury Charge

Halton contends in his second and third points of error that the trial court erred by failing to properly define and apply the term "dating relationship" in the jury charge and by failing to limit the definitions of intentionally, knowingly, and recklessly in the jury charge to the

–10–

applicable conduct element of the offense. Halton did not object to the jury charge at trial; however, he argues he was egregiously harmed by the purported charge errors.

*Standard of Review*

Our first duty in analyzing a jury-charge issue is to decide whether error exists. *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012). If error exists, we then determine whether the error caused sufficient harm to warrant reversal. *Ngo v. state*, 175 S.W.3d 738, 743–44 (Tex. Crim. App. 2005). When, as in this case, the error was not objected to, the error must be "fundamental" and requires reversal only if it was "so egregious and created such harm that the defendant was deprived of a fair and impartial trial." *Villarreal v. State*, 453 S.W.3d 429, 433 (Tex. Crim. App. 2015) (citing *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g)). Egregious harm exists when the record shows that a defendant has suffered actual, rather than merely theoretical, harm from jury-charge error. *Nava v. State*, 415 S.W.3d 289, 298 (Tex. Crim. App. 2013); *Almanza*, 686 S.W.2d at 174. Egregious harm consists of error affecting the very basis of the case, depriving the defendant of a valuable right, or vitally affecting a defense theory. *Nava*, 415 S.W.3d at 298 (citing *Cosio v. State*, 353 S.W.3d 766, 777 (Tex. Crim. App. 2011)). "Egregious harm is a 'high and difficult standard' to meet, and such a determination must be 'borne out by the trial record.'" *Villarreal*, 453 S.W.3d at 433 (quoting *Reeves v. State*, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013)). We assess harm in light of "the entire jury charge, the state of the evidence (including the contested issues and the weight of probative evidence), the arguments of counsel, and any other relevant information revealed by the record of the trial as a whole." *Nava*, 415 S.W.3d at 298. "[I]n making our determination, we may presume that the jury acted rationally, at least absent a showing to the contrary." *Alvarado v. State*, 912 S.W.2d 199, 216 (Tex. Crim. App. 1995) (quoting *Richardson v. State*, 879 S.W.2d 874, 882 (Tex. Crim. App. 1993)).

–11–

*Definition of "Dating Relationship" in the Jury Charge*

In his second point of error, Halton contends the trial court provided an incomplete statutory definition of "dating relationship" in the jury charge. The State responds the trial court did not err in charging the jury on the definition of "dating relationship," and even if there was error, Halton, who did not object to the jury charge, was not egregiously harmed.

A person commits assault if he "intentionally, knowingly, or recklessly causes bodily injury to another . . . ." TEX. PENAL CODE ANN. § 22.01(a)(1) (West 2011). The offense is generally a Class A misdemeanor but is elevated to a third-degree felony if (1) the offense is committed against a person with whom the defendant has or has had a "dating relationship," and (2) "the offense is committed by intentionally, knowingly, or recklessly impeding the normal breathing or circulation of the blood of the person by applying pressure to the person's throat or neck or by blocking the person's nose or mouth." *See id.* § 22.01(b)(2)(B); TEX. FAM. CODE ANN. § 71.0021(b). Here, the jury charge contained the following language concerning the definition of "dating relationship":

> "Family" includes individuals related by consanguinity (blood) or affinity (marriage), individuals who are former spouses of each other, individuals who are the parents of the same child, without regard to marriage, or individuals in a dating relationship. Dating relationship means a relationship between individuals who have or have had a continuing relationship of a romantic or intimate nature.

The penal code does not contain a definition of dating relationship. Rather, section 22.01(b)(2) of the penal code refers to section 71.0021(b) of the family code. *See* TEX. PENAL CODE ANN. § 22.01(b)(2). Section 71.0021(b) of the family code provides that "dating relationship" means "a relationship between individuals who have or have had a continuing relationship of a romantic or intimate nature." TEX. FAM. CODE ANN. § 71.0021(b). Section 71.0021(b) then describes the considerations relevant to the determination of whether a dating relationship exists:

–12–

> The existence of such a relationship shall be determined based on consideration of:
>> (1) the length of the relationship;
>> (2) the nature of the relationship; and
>> (3) the frequency and type of interaction between the persons involved in the relationship.

*Id.* Section 71.0021(c) provides that a "casual acquaintanceship or ordinary fraternization in a business or social context does not constitute a 'dating relationship' under subsection (b)." *Id.* § 71.0021(c). Without citing authority to support his contention, Halton argues the trial court erred in defining "dating relationship" by failing to include the factors contained in section 71.0021(b) used in determining whether a dating relationship exists (length of relationship, nature of relationship, and frequency and type of interaction) and the language of section 71.0021(c) excluding social acquaintances and business fraternization as dating relationships.

Assuming, without deciding, that the trial court erred by not including in the jury charge the factors listed in section 71.0021(b) for determining whether a dating relationship existed, and the language of section 71.0021(c) excluding social acquaintances and business fraternization from the definition of dating relationships, Halton nevertheless could not on this record have suffered egregious harm as a result of the error. In determining whether Halton suffered egregious harm, we consider (1) the charge itself; (2) the state of the evidence, including contested issues; (3) argument of counsel; and (4) any other relevant information revealed by the record of the trial as a whole. *See Almanza*, 686 S.W.2d at 171. For purposes of our analysis of the first *Almanza* factor, we assume the jury charge was erroneous by the omission of the factors listed in section 71.0021(b) and the language of section 71.0021(c). With regard to the second *Almanza* factor concerning the "state of the evidence," Halton's judicial confession and stipulation in Case No. F-1272132-U that he "has and has had a dating relationship with [Thomas] and [Halton] was a member of [Thomas's] family and household" was admitted in evidence. *See Ciulla v. State*, 465 S.W.2d 150, 150 (Tex. Crim. App. 1971) (judicial confession

–13–

which was introduced in evidence was sufficient to support conviction); *Bryant v. State*, 187 S.W.3d 397, 400 (Tex. Crim. App. 2005). Given Halton's stipulation to and judicial confession of the existence of a dating relationship with Thomas, the absence in the jury charge of the factors listed in section 71.0021(b) for determining whether a dating relationship existed, and the language of section 71.0021(c) excluding social acquaintances and business fraternization from the definition of dating relationship, did not cause Halton actual, rather than theoretical, harm. *See Almanza*, 686 S.W.2d at 174. With regard to the third *Almanza* factor concerning the argument of counsel, both defense counsel and the prosecutor addressed the evidence relating to the nature of the relationship between Halton and Thomas, including defense counsel's arguments that the relationship did not constitute a dating relationship but, instead, was merely a business relationship. Having reviewed the entire record, and given Halton's stipulation to and judicial confession of the existence of a dating relationship with Thomas, we cannot conclude that this *Almanza* factor weighs in favor of concluding Halton was egregiously harmed by the absence in the jury charge of the factors listed in section 71.0021(b) for determining whether a dating relationship existed, and the language of section 71.0021(c) excluding social acquaintances and business fraternization from the definition of dating relationship. As to the fourth *Almanza* factor, our review of the record has disclosed no other relevant information that requires our consideration. *See Almanza*, 686 S.W.2d at 171.

Even assuming the jury charge erroneously failed to contain the factors listed in section 71.0021(b) for determining whether a dating relationship existed, and the language of section 71.0021(c) excluding social acquaintances and business fraternization from the definition of dating relationships, we conclude on this record that Halton was not egregiously harmed by such omissions from the jury charge. We resolve Halton's second point of error against him.

*Definitions of Culpable Mental States in the Jury Charge*

In his third point of error, Halton asserts he was egregiously harmed by the trial court's failure to limit the definitions of intentionally, knowingly, and recklessly in the abstract portion of the jury charge to the applicable conduct element of the offense. The State acknowledges the jury charge erroneously failed to "tailor the culpable mental state definitions to the conduct elements of the offense." However, the State argues that since Halton did not object to the jury charge at trial, reversal is required only if the trial court error resulted in egregious harm, which is not shown on this record.

"Section 6.03 of the penal code sets out: four culpable mental states—intentionally, knowingly, recklessly, and criminally negligently; two possible conduct elements—nature of the conduct and result of the conduct; and the effect of the circumstances surrounding the conduct." *Price v. State*, 457 S.W.3d 437, 441 (Tex. Crim. App. 2015); *see also* TEX. PENAL CODE ANN. § 6.03 (West 2011). In a jury charge, the language regarding the culpable mental states must be tailored to the conduct elements of the offense. *Price*, 457 S.W.3d at 441. A trial court errs by failing to limit the definitions of the culpable mental states to the conduct element or elements of the offense to which they apply. *Id.*; *Ash v. State*, 930 S.W.2d 192, 194 (Tex. App.—Dallas 1996, no pet.).

The gravamen of the offense is utilized to determine which conduct elements should be included in the culpable mental-state language of the jury charge. *Price*, 457 S.W.3d at 441. If the gravamen of the offense is the result of conduct, the jury charge definitions of culpable mental states should be tailored to the result of the conduct. *Id.* Assault cannot be committed without bodily injury, and the "gravamen of assault with bodily injury is injury, a result of conduct." *Id.* at 442. Halton was charged with family-violence assault by strangulation under

section 22.01 of the penal code.[3]  Section 22.01(a)(1) provides that "[a] person commits [assault] if the person intentionally, knowingly, or recklessly causes bodily injury to another . . . ."  TEX. PENAL CODE ANN. § 22.01(a)(1).  The gravamen of the charged offense is conduct that "causes bodily injury."  *Id*.; *see also Dolkart v. State*, 197 S.W.3d 887, 893 (Tex. App.—Dallas 2006, pet. ref'd).  Bodily injury assault is a result-of-conduct offense that can be committed intentionally, knowingly, or recklessly.  *Dolkart*, 197 S.W.3d at 893.  The jury charge definitions of intentionally, knowingly, and recklessly should have tied those definitions solely to the result of conduct.  *Price*, 457 S.W.3d at 443.

According to Halton, there is "very little" evidence of bodily injury to Thomas.  He argues he was egregiously harmed by the jury-charge error because "[a] juror could have read the instructions and concluded [Halton] caused bodily injury by engaging in conduct without regard to the existence of any resulting injury."  Considering the jury charge as a whole and after reviewing the record, we disagree.

Under *Almanza,* we first consider the entire jury charge.  *Almanza*, 686 S.W.2d at 171. Here, the abstract portion of the jury charge set out the applicable penal offenses as follows:

> Our law provides that a person commits the offense of assault if he intentionally, knowingly, or recklessly causes bodily injury to a member of his family or household by impeding the normal breathing and circulation of the complainant's blood by applying pressure to their throat and neck or by blocking their nose and mouth with the use of hands.

* * *

---

[3] Family-violence assault by strangulation, as was alleged in this case, is defined in two related subsections of section 22.01 of the penal code.  Section 22.01(a)(1) provides that "[a] person commits an offense if the person . . . intentionally, knowingly, or recklessly causes bodily injury to another, including the person's spouse."  TEX. PENAL CODE ANN. § 22.01(a)(1).  The base level of this offense is a Class A misdemeanor.  *Id*. § 22.01(b).  However, section 22.01(b)(2)(B) raises the offense to a third-degree felony if the assault is committed against a person whose relationship to or association with the defendant is described by section 71.002(b) of the family code and the offense is committed by "intentionally, knowingly, or recklessly impeding the normal breathing or circulation of the blood of the person by applying pressure to the person's throat or neck or by blocking the person's nose or mouth[.]"  *Id*. § 22.01(b)(2)(B).  Assault under section 22.01(a)(1) may also become a third-degree felony if the defendant has previously been convicted of a family-violence offense.  *Id*. § 22.01(b)(2)(A).  And the offense may become a second-degree felony if the defendant strangles or suffocates the victim and has a prior family-violence conviction.  *Id*. § 22.01(b-1).

–16–

Our law provides that a person commit's [sic] a Misdemeanor Assault if he intentionally or knowingly or recklessly causes bodily injury to another and the said defendant has or has had a dating relationship with the said complainant or the said defendant was a member of the complainant's family or household.

* * *

Our law provides that a person commit's [sic] a Misdemeanor Assault if he intentionally or knowingly or recklessly causes bodily injury to another.

The abstract portion of the jury charge set out definitions of the following culpable mental states:

A person acts intentionally, or with intent, with respect to the nature of his conduct when it is his conscious objective or desire to engage in the conduct.

A person acts knowingly, or with knowledge, with respect to the nature of his conduct or to circumstances surrounding his conduct when he is aware of the nature of his conduct or that the circumstances exist.

A person acts recklessly, or is reckless, with respect to circumstances surrounding his conduct or the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.

The application paragraphs of the jury charge provided:

### ASSAULT FAMILY VIOLENCE - IMPEDING BREATHING

If you find and believe from the evidence beyond a reasonable doubt that the defendant, Craig Everett Halton, on or about September 11, 2013, in Dallas County, Texas, did unlawfully, then and there, intentionally, knowingly, or recklessly cause bodily injury to another, namely, Latoya Thomas, hereafter called the complainant, by impeding the normal breathing and circulation of the complainant's blood by applying pressure to the complainant's throat and neck or by blocking the complainant's nose and mouth with the use of an arm, and the said defendant has or has had a dating relationship with the said complainant or the said defendant was a member of the complainant's family or household, then you will find the defendant guilty of assault, as charged in the indictment.

* * *

### MISDEMEANOR ASSAULT - FAMILY VIOLENCE

Now if you find from the evidence beyond a reasonable doubt that on or about the 11th day of September, 2013, in Dallas County, State of Texas, the

–17–

defendant Craig Everett Halton, did unlawfully then and there knowingly or intentionally or recklessly cause bodily injury to another, namely: Latoya Thomas, hereinafter called Complainant, , [sic] and the said defendant has or has had a dating relationship with the said complainant or the said defendant was a member of the complainant's family or household then you will find the defendant guilty of the lesser included offense of Misdemeanor Assault Family Violence.

* * *

### MISDEMEANOR ASSAULT - NO FAMILY VIOLENCE

Now if you find from the evidence beyond a reasonable doubt that on or about the 11th day of September, 2013, in Dallas County, Texas, the defendant Craig Everett Halton did unlawfully then and there knowingly or intentionally or recklessly cause bodily injury to another, namely Latoya Thomas, hereinafter called Complainant, then you will find the defendant guilty of the lesser included offense of Misdemeanor Assault.

Here, the abstract portion of the charge included the proper statutory definitions of family-violence assault by strangulation and the lesser-included offenses of misdemeanor assault, with and without family violence. *See* TEX. PENAL CODE ANN. §§ 22.01(a), (b)(2)(B). However, the definitions of "intentionally" and "knowingly" incorrectly allowed the jury to consider the nature of an offender's conduct, and the definitions of "knowingly" and "recklessly" incorrectly allowed the jury to consider the circumstances surrounding an offender's conduct. *See Saldivar v. State*, 783 S.W.2d 265, 267–68 (Tex. App.—Corpus Christi 1989, no pet.) (when an offense is only a "result" type offense, court should submit statutory definitions of "intentionally" or "knowingly" which are limited to the culpable mental state required).

Significantly, the application paragraphs of the charge consistently and clearly instructed the jury that in order to convict Halton of assault, it must find beyond a reasonable doubt that Halton intentionally, knowingly, or recklessly caused bodily injury to Thomas. The application paragraphs are the "heart and soul" of the jury charge. *See Vasquez v. State*, 389 S.W.3d 361, 367 (Tex. Crim. App. 2012) (application paragraph is that portion of the jury charge that applies the pertinent penal law, abstract definitions, and general legal principles to the particular facts

and the indictment allegations). "It is the application paragraph of the charge, not the abstract portion, that authorizes a conviction.'" *Yzaguirre v. State*, 394 S.W.3d 526, 530 (Tex. Crim. App. 2013 (quoting *Crenshaw v. State*, 378 S.W.3d 460, 466 (Tex. Crim. App. 2012)). "Where the application paragraph correctly instructs the jury, an error in the abstract instruction is not egregious." *Medina v. State*, 7 S.W.3d 633, 640 (Tex. Crim. App. 1999).[4] We presume the jury followed the instructions in the application paragraphs of the charge, and Halton has not shown otherwise. *See Williams v. State*, 937 S.W.2d 479, 490 (Tex. Crim. App. 1996) ("[W]e assume that the jury would follow the instruction as given, and we will not reverse in the absence of evidence that the jury was actually confused by the charge."). The jury charge as a whole does not weigh in favor of a conclusion that Halton suffered some actual, rather than theoretical, harm from the incorrect definitions of intentionally, knowingly, and recklessly in the jury charge. We conclude the error in the definitions of the terms intentionally, knowingly, and recklessly in the jury charge did not cause egregious harm because the application paragraphs of the charge properly instructed the jury.

With respect to the second *Almanza* factor to be considered, the "state of the evidence," *see Almanza*, 686 S.W.2d at 171, Halton asserts there is "very little" evidence of bodily injury in this case. We disagree. Considering the entirety of the record, there is sufficient evidence for a rational jury to find Thomas intentionally, knowingly, or recklessly caused bodily injury to Thomas. Thomas testified that, after punching her in the face three times, Halton choked her to the point she could not breathe. Thomas testified she experienced pain, she urinated on herself during the assault, she had bruises and purple marks on her neck as a result of being choked by Halton, and she was sore for a week or two following the assault. Halton argues there were no

---

[4] *See also Pierce v. State*, No. 05-12-01211-CR, 2013 WL 6196275, at *7 (Tex. App.—Dallas Nov. 25, 2013, no pet.) (mem. op., not designated for publication) (when application paragraph of charge correctly instructs the jury on law applicable to the case, any error in abstract instruction is not egregious).

visible marks on Halton's neck in the photographs introduced into evidence, but Greene testified that visible marks from strangulation are not always immediately visible and may be more difficult to see on victims with a darker complexion. Greene also testified urinating on oneself can result from strangulation. Peterson testified that, after Halton released his hold on Thomas, she was having difficulty breathing and was wheezing. Although the evidence established that Thomas did not go to the hospital following the incident, Peterson testified that an ambulance was called to the scene because Thomas wanted to be "checked out" and was in pain. Whyte testified there was no doubt in his mind that Halton was choking Thomas and that she was gasping for air. O'Dell testified Thomas described being in a great deal of pain following the assault. Here, there was sufficient evidence for a rational jury to find beyond a reasonable doubt that Halton's assault on Thomas caused bodily injury to her. This factor does not weigh in favor of a conclusion Halton suffered some actual, rather than theoretical, harm from the trial court's error in the definitions of the terms intentionally, knowingly, and recklessly in the jury charge.

The third *Almanza* factor requires that we next consider the arguments of counsel. *See Almanza*, 686 S.W.2d at 171. The State's closing argument clearly focused on the result of appellant's conduct, bodily injury to Thomas. Initially, the State mentioned to the jury that:

> [T]he four options you have are 1, that he's guilty, in fact, of the assault, family violence, impeding breath or circulation. Option No. 2, he's guilty of misdemeanor assault, family violence. Option 3 is that he's guilty of an assault, but no family violence. And option 4 is that he's not guilty of anything.

The State then argued:

> [T]he defendant . . . intentionally, knowingly, or recklessly caused bodily injury by choking, strangling — and, in this particular case, we're talking about him putting her in an arm bar, a choke hold, for lack of a better term, and there's a number of people who testified to the fact that's what occurred on that day, and that it did, in fact, hurt.

The State continued by arguing the evidence demonstrated Halton caused bodily injury to Thomas by strangling her in a manner that could have killed her. The State emphasized that an

–20–

absence of marks and bruises on Thomas's neck after the assault was not indicative that she was not injured by Halton, reminding the jury of Thomas's testimony that she was in pain and experienced difficulty breathing following the assault, as well as Greene's testimony that marks are not always visible following strangulation and may be less visible on a victim, such as Thomas, with a dark complexion. The closing argument of the defense also focused on the result of conduct, bodily injury. The defense argued there was reasonable doubt as to whether or not Thomas was "actually injured" by Halton. The defense argued the State brought no medical records showing Halton caused Thomas bodily injury, Thomas was "basically" the source of testimony regarding bodily injury she sustained at the hands of Halton, and there were no physical marks demonstrating Thomas sustained bodily injury.

The record is clear that the State did not erroneously argue the culpable mental state necessary for the charged offense. The closing argument of both parties was focused on the result of conduct, bodily injury. We find nothing in the closing arguments to indicate Halton suffered some actual, rather than theoretical, harm from the erroneous definitions of intentionally, knowingly, and recklessly in the jury charge.

The final *Almanza* factor addresses any other relevant information revealed by the record of the trial as a whole. *See Almanza*, 686 S.W.2d at 171. We have reviewed the record and have found no other relevant information that requires our consideration.

On this record, we conclude the trial court's error in failing to tailor the definitions of the culpable mental states to the applicable conduct element of the offense in the abstract portion of the jury charge caused no actual, as opposed to theoretical, harm to Halton. Accordingly, we resolve Halton's third point of error against him.

**Admission of Prior Conviction in Guilt-Innocence Phase of Trial**

In his fourth point of error, Halton asserts the trial court erred by admitting evidence of his prior conviction at the guilt-innocent stage of trial. Halton argues the admission of his prior conviction for family-violence assault to prove a dating relationship with Thomas was harmful error.

We review the trial court's decision to admit or exclude evidence under an abuse of discretion standard. *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010). The trial court abuses its discretion when its ruling is arbitrary, unreasonable, or without reference to any guiding rules or principles. *Lyles v. State*, 850 S.W.2d 497, 502 (Tex. Crim. App. 1993). The trial court does not abuse its discretion unless its determination lies outside the zone of reasonable disagreement. *Martinez*, 327 S.W.3d at 736.

In a pre-trial hearing, the trial court granted Halton's motion in limine in which he requested a hearing outside the presence of the jury before any evidence of an extraneous offense was offered in evidence. During trial, a hearing was conducted outside the presence of the jury regarding the State's assertion that Halton had "opened the door" during cross-examination of Thomas for admission of Halton's judicial confession in his prior conviction for a family-violence assault on Thomas that he "has and has had a dating relationship with [Thomas], and [Halton] was a member of [Thomas's] family and household." Halton's counsel responded that the door had not "been opened" in his questioning of Thomas. The trial court indicated in that hearing that it "believe[d] that the door has been opened as to the dating relationship between the parties," and it was going to allow the prior family-violence assault into evidence "for the sole purpose of helping [the jury] determine whether or not [Thomas] was a member of [Halton's] household or with whom [Halton] had a prior dating relationship and for no other purpose." When Thomas's testimony was continued before the jury and evidence of Halton's prior

conviction for family-violence assault on Thomas was offered by the State,[5] Halton's counsel affirmatively stated, "No objection, Your Honor," and the trial court admitted the exhibit in evidence.[6]

Rule of evidence 103(b) provides, "When the court hears a party's objections outside the presence of the jury and rules that evidence is admissible, a party need not renew an objection to preserve a claim of error for appeal." TEX. R. EVID. 103(b). Here, however, when Thomas's testimony was continued and evidence of the prior conviction was offered by the State, Halton's counsel affirmatively stated there was "no objection" to the evidence. *See Thomas v. State*, 408 S.W.3d 877, 884 (Tex. Crim. App. 2013) ("Our case law makes it clear that a statement of 'no objection' when the complained-of evidence is eventually proffered at trial—at least, without more—will signal to the trial court an unambiguous intent to abandon the claim of error that was earlier preserved for appeal."); *Dean v. State*, 749 S.W.2d 80, 83 (Tex. Crim. App. 1988) ("When an accused affirmatively asserts during trial that he has 'no objection" to the admission of the complained of evidence, he waives any error in the admission of the evidence despite the pretrial ruling."). Nothing in the record plainly demonstrates Halton did not intend, or that the trial court did not construe, his "no objection" statement to constitute an abandonment of a claim of error. Under these circumstances, Halton's "no objection" statement, "by itself, serves as an unequivocal indication that a waiver was both intended and understood." *See Thomas*, 408 S.W.3d at 886–87. Accordingly, we are compelled to conclude that this issue has not been preserved for appellate review. *See id.* We resolve Halton's fourth point of error against him.

---

[5] The exhibit offered into evidence relating to Halton's prior conviction contained a copy of the judgment, a fingerprint form, the State's motion to reduce the charged offense, the State's motion to strike enhancement paragraphs from the indictment, Halton's judicial confession, an affidavit for arrest warrant, and the indictment.

[6] The trial court then instructed the jury that "this evidence is being admitted for the sole purpose of helping you determine whether or not [Thomas] was a member of [Halton's] household or with whom [Halton] had a dating relationship and for no other purpose."

## Definition of "Reasonable Doubt" in the Jury Charge

In his fifth point of error, Halton argues the trial court "committed structural error" by including a definition of reasonable doubt in the jury charge. The trial court instructed the jury that the State had the burden of proof beyond a reasonable doubt as to each element of the offense. The charge then instructed the jury, "It is not required that the prosecution proves guilt beyond all possible doubt, but it is required that the prosecution's proof excludes all reasonable doubt concerning the defendant's guilt." Halton contends this instruction impermissibly defines "reasonable doubt." *See Paulson v. State*, 28 S.W.3d 570, 573 (Tex. Crim. App. 2000).

The court of criminal appeals has concluded a trial court does not abuse its discretion by giving the complained-of instruction. *See Mays v. State*, 318 S.W.3d 368, 389 (Tex. Crim. App. 2010); *see also O'Canas v. State*, 140 S.W.3d 695, 702 (Tex. App.—Dallas 2003, pet. ref'd) (complained-of instruction "simply states the legally correct proposition that the prosecution's burden is to establish proof beyond a *reasonable* doubt and not *all possible* doubt" and does not define reasonable doubt).[7] Therefore, the instruction given in this case did not define reasonable doubt, and the trial court did not err by including it in the jury charge. *See Mays*, 318 S.W.3d at 389. We resolve Halton's fifth point of error against him.

## Trial Court's Jurisdiction to Hear the Case and Render Judgment

In his sixth point of error, Halton contends the trial court lacked jurisdiction to hear the case and render judgment because the case was not transferred to its docket. The State responds

---

[7] *See also Gullatt v. State*, Nos. 05-13-01515-CR & 05-13-01516-CR, 2014 WL 7499045, at *2 (Tex. App.—Dallas Dec. 29, 2014, no pet.) (mem. op., not designated for publication); *Brown v. State*, No. 05-10-00328-CR, 2011 WL 2477649, at *4 (Tex. App.—Dallas June 23, 2011, pet. ref'd) (not designated for publication).

that the trial court had jurisdiction over this case, and this Court has previously decided this issue contrary to Halton's contention. Halton acknowledges that "authority is against his position."[8]

The basis for Halton's argument is that the indictment in this case was presented to the 282nd Judicial District Court of Dallas County; subsequently, the case appeared on the docket of the 291st Judicial District Court of Dallas County, where it remained through the entry of judgment. No transfer order appears in the record. Therefore, Halton contends the 282nd Judicial District Court retained jurisdiction and the 291st Judicial District Court never acquired jurisdiction over this case.

Halton failed to file a formal plea to the jurisdiction with the trial court. Therefore, he failed to preserve this complaint for appeal. *See Mills v. State*, 742 S.W.2d 831, 835 (Tex. App.—Dallas 1987, no pet.); *Lemasurier v. State*, 91 S.W.3d 897, 899–900 (Tex. App. —Fort Worth 2002, pet. ref'd) (fact that no transfer order contained in record is procedural matter, not jurisdictional; defendant who fails to file plea to jurisdiction waives complaint) (quoting *Evans v. State*, 61 S.W.3d 688, 690 (Tex. App.—Fort Worth 2001, no pet.).[9]

Even if Halton had preserved this complaint for appeal, we conclude his argument lacks merit. A grand jury formed and impaneled by a district judge inquires "into all offenses liable to indictment," and hears all the testimony available before voting on whether to indict an accused. TEX. CODE CRIM. PROC. ANN. arts. 20.09, 20.19 (West 2005). Because the court "exercises some 'supervisory power over the grand jury,'" the grand jury is "often characterized as an arm of the court by which it is appointed rather than an autonomous entity." *Borque v. State*, 156 S.W.3d 675, 678 (Tex. App.—Dallas 2005, pet. ref'd) (quoting *Dallas Cnty. Dist. Attorney v. Doe*, 969

---

[8] *See Ward v. State*, No. 05-14-00270-CR, 2015 WL 1569823, at *6 (Tex. App.—Dallas Apr. 3, 2015, no pet.) (mem. op., not designated for publication); *Gullatt v. State*, 2014 WL 7499045, at *3; *Brown v. State*, 2011 WL 2477649, at *5; *Chappel v. State*, No. 05-10-00629-CR, 2011 WL 2438520, at *1 (Tex. App.—Dallas June 20, 2011, no pet.) (not designated for publication).

[9] *See Gullatt*, 2014 WL 7499045, at *3; *Gates v. State*, No. 05-11-00404-CR, 2012 WL 753647, at *1 (Tex. App.—Dallas Mar. 9, 2012, pet. ref'd) (mem. op., not designated for publication); *Brown*, 2011 WL 2477649, at *5.

S.W.2d 537, 542 (Tex. App.—Dallas 1998, no pet.)). After the conclusion of testimony, a grand jury votes "as to the presentment of an indictment." TEX. CODE CRIM. PROC. ANN. art. 20.19. Following presentment, an indictment is filed in a court with jurisdiction to hear the case. *See Borque*, 156 S.W.3d at 678 (citing *Hultin v. State*, 171 Tex. Crim. 425, 351 S.W.2d 248, 255 (1961)). District judges in counties having two or more district courts "may adopt rules governing the filing and numbering of cases, the assignment of cases for trial, and the distribution of the work of the courts as in their discretion they consider necessary or desirable for the orderly dispatch of the business of the courts." TEX. GOV'T CODE ANN. § 24.024 (West Supp. 2014); *see also id*. § 74.093 (West 2013) (addressing adoption of local rules of administration to provide, in part, for assignment, docketing, transfer, and hearing of cases). Thus, a specific district court may impanel a grand jury, but it does not necessarily follow that all cases returned by that grand jury are assigned to the impaneling court. *Bourque*, 156 S.W.3d at 678.

While the record shows the 282nd Judicial District Court presided over the grand jury that returned the indictment, the case was thereafter filed in the 291st Judicial District Court. We take judicial notice that both of these courts are located in Dallas County. Nothing in the record indicates the case was ever filed in or appeared on the trial docket of the 282nd Judicial District Court. Because the 291st Judicial District Court had jurisdiction to hear Halton's case and render the judgment, we resolve Halton's sixth point of error against him.

**Reformation of Judgment**

We may modify a trial court's judgment to correct a clerical error when we have the necessary information before us to do so. TEX. R. APP. P. 43.2(b); *Asberry v. State*, 813 S.W.2d 526, 529–30 (Tex. App.—Dallas 1991, pet. ref'd). The reporter's record reflects Halton pleaded "not true" to the first enhancement paragraph and "true" to the second enhancement paragraph of

–26–

the indictment. The judgment erroneously reflects that Halton pleaded true to the first enhancement paragraph. Accordingly, we reform the judgment in Case No. F-1371883-J to reflect that Halton pleaded "not true" to the first enhancement paragraph. The judgment is thus reformed to read: "Plea to 1st Enhancement Paragraph: Not true."

## Conclusion

As reformed, the judgment is affirmed.

/Robert M. Fillmore/
ROBERT M. FILLMORE
JUSTICE

Do Not Publish
TEX. R. APP. P. 47.2(b)

140640F.U05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

CRAIG EVERETT HALTON, Appellant

No. 05-14-00640-CR      V.

THE STATE OF TEXAS, Appellee

On Appeal from the 291st Judicial District Court, Dallas County, Texas,
Trial Court Cause No. F-1371883-U.
Opinion delivered by Justice Fillmore, Justices Myers and Evans participating.

Based on the Court's opinion of this date, the judgment of the trial court is **MODIFIED** as follows:

Plea to 1st Enhancement Paragraph: Not true.

As **REFORMED**, the judgment is **AFFIRMED**.

Judgment entered this 1st day of July, 2015.